UNITED STATES of America,
Plaintiff-Appellee,

v.

Angel John ZABANEH,
Defendant-Appellant.

No. 87–1112.

United States Court of Appeals,
Fifth Circuit.

Feb. 9, 1988.

John E. Ackerman, Houston, Tex., Gerald H. Goldstein, San Antonio, Tex., for defendant-appellant.

James T. Jacks, Asst. U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before GOLDBERG, WILLIAMS and HIGGINBOTHAM, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellant, Angel John Zabaneh, was convicted on seven counts relating to possession and distribution of marihuana in violation of 18 U.S.C. §§ 2 and 3237(a), 21 U.S.C. §§ 841(a)(1) and (b)(6), and 21 U.S.C. §§ 951 *et seq.* He was sentenced to a total of 25 years in prison. All counts related to a single shipment of marihuana from the country of Belize to Texas on December 8, 1981. Appellant raises ten issues on appeal, some of which merit careful attention. We hold that the district court erred in sustaining appellant's conviction under count five, and in failing to make the required *Beechum-Robinson* [1] findings before admitting extrinsic offense testimony by three of the Government's witnesses. We affirm the district court's holdings on the remaining points of error on appeal.

### I. *Facts*

Texas Narcotics Division agents arrested three persons near Longview, Texas on December 9, 1981, as they attempted to smuggle a quantity [2] of marihuana into the United States from Belize. One of those arrested, Fred Tonjes, agreed as part of a plea

---

1. *United States v. Robinson,* 700 F.2d 205 (5th Cir.1983); *United States v. Beechum,* 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979).

2. The actual amount was not established at trial.

agreement to provide information concerning his involvement in drug trafficking. He told agents in December, 1985, that appellant Zabaneh had been one of his suppliers in Belize, and that appellant had supplied the marihuana seized at the time he, Tonjes, was arrested. Based on this and other information, a complaint was filed in the Northern District of Texas charging appellant with conspiracy to distribute marihuana.[3]

Appellant, a citizen of Belize, operated citrus and banana farms there. Along with two others from Belize, he flew to Guatemala City on November 10, 1985. According to the magistrate's findings of fact, the three were stopped between immigration and customs by a person wearing a "Miami Vice" cap who identified himself as a United States narcotics agent. Appellant and the others were taken to a small room at the airport where they were strip-searched and detained until the next morning, when a United States DEA agent flew with appellant in his custody to Houston, Texas.

On arrival in Houston, appellant was formally arrested on an indictment then pending in the Eastern District of Louisiana. During the following month and a half, appellant was detained on a series of indictments lodged in the Eastern District of Louisiana, the Southern District of Mississippi, and the Northern District of Texas. All but the last were dismissed, and eventually appellant was taken to the Northern District of Texas for trial.

*Trial, conviction, sentencing.*

The case was tried to a jury in the Northern District. Appellant was found guilty on seven counts which can be summarized as follows:

*Count 1:* conspiracy to import marihuana, in violation of 21 U.S.C. §§ 952(a), 959, and 963;

*Count 2:* possession of approximately 1,160 pounds of marihuana with intent to import, in violation of 18 U.S.C. §§ 2 and 3237(a), and 21 U.S.C. §§ 955a(d)(1) and 960(b)(1);

*Count 3:* distribution of approximately 1,160 pounds of marihuana with intent to import, in violation of 18 U.S.C. §§ 2 and 3237(a), and 21 U.S.C. §§ 959(a)(1) and 960(a)(3);

*Count 5:* aiding and abetting the importation of approximately 1,160 pounds of marihuana, in violation of 18 U.S.C. § 2, and 21 U.S.C. §§ 952(a) and 960(a)(1);

*Count 6:* aiding and abetting the importation of approximately 1,160 pounds of marihuana without proper registration, in violation of 18 U.S.C. § 2, and 21 U.S.C. §§ 957(a)(1) and 960(a)(1);

*Count 7:* aiding and abetting the possession of approximately 1,160 pounds of marihuana aboard an aircraft although not listed in its manifest as cargo or part of supplies of aircraft, in violation of 18 U.S.C. § 2 and 21 U.S.C. §§ 955 and 960(a)(2); and

*Count 8:* aiding and abetting the possession of approximately 1,160 pounds of marihuana with intent to distribute, in violation of 18 U.S.C. § 2, and 21 U.S.C. §§ 841(a)(1) and (b)(6).

Appellant was sentenced to five years' imprisonment on each of counts 1, 2, 3, 5, and 6, the terms to run consecutively, five years on counts 7 and 8 to run concurrently with the sentence on count 1, and a special parole term of not less than 2 years on each of counts 2, 3, 5, 6, 7, and 8, to run concurrently.

## II. *Issues on Appeal*

Appellant presents a number of issues, several of which are of substantial significance. We dispose of three lesser issues first.

A. *Is § 955a(d)(1) limited to activities on vessels? (Count 2)*

 Appellant urges that his conviction on count 2 must be reversed because, al-

---

**3.** Although Longview is in the Eastern District of Texas the complaint was filed in the Northern District because the aircraft used in the December 8, 1981, episode had flown that morning to Belize from Rockwall County, and had attempted to return there with the marihuana that evening before diverting to Longview, Texas, because of heavy fog. Rockwall County is in the Northern District.

though 21 U.S.C. § 955a refers in its title to possession of controlled substances on board vessels, the Government offered no evidence that he possessed such substance aboard a vessel. This contention lacks merit. The plain language of § 955a(d)(1), under which appellant was charged in count 2, made no mention of vessels. Appellant correctly notes that the Supreme Court has held that, absent a "clearly expressed legislative intent to the contrary," the language of a criminal statute "must ordinarily be regarded as conclusive." *Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 1141, 67 L.Ed.2d 275 (1981). The fact that Congress in 1986 redesignated §§ 955a to 955c as the "Maritime Drug Law Enforcement Act," 46 U.S.C. §§ 1901–1903, does not manifest such contrary intent as to the applicability of § 955a in 1980 when the offense occurred. The intended scope of § 955a was clearly indicated: "This section is intended to reach acts of possession, manufacture or distribution committed outside the territorial jurisdiction of the United States." 21 U.S.C. § 955a(h). Neither § 955a(d) nor § 955a(h) at that time contained any reference to vessels.

### B. *Does § 955 apply only to importation on common carriers? (Count 7)*

■ Appellant contends that 21 U.S.C. § 955 applies only to common carriers, and that his conviction on count 7 therefore should be reversed, since the airplane used in the December 8, 1981, conveyance of marihuana was a private craft. This contention is frivolous. The statutory language plainly is not limited to possession or transportation on commercial or common carriers. On the contrary, it reads: "It shall be unlawful for any person to bring or possess on board *any* vessel or aircraft, or on board any vehicle of a carrier ..." (emphasis added). Section 955 has previously been utilized in the prosecution of persons who imported controlled substances into the United States via private aircraft. *United States v. Tussell*, 441 F.Supp. 1092 (M.D.Pa.1977). It is applicable here.

### C. *Was § 955 intended to reach consummated importations? (Count 7)*

■ Appellant also contends that he should be acquitted on count 7 on the theory that § 955 was intended to reach only aiding and abetting unconsummated importations, while the evidence showed aiding and abetting a consummated importation. He relies upon *United States v. Valot*, 481 F.2d 22, 27 (2d Cir.1973) in making this claim. This contention also is without merit. The importation in question clearly was unconsummated before it was consummated.

A more significant question, at which appellant only hints, is whether, since he was convicted on count 5 for consummated importation under § 952, the offenses of attempted and completed importation should merge so as to preclude a separate conviction under § 955 on count 7 for the former offense. In *Valot*, the Second Circuit held that the defendant had been improperly sentenced to consecutive terms for convictions under §§ 955 and 952. 481 F.2d at 27. Here, appellant's sentence under count 7 is to run concurrently with his sentences under counts 1 and 8.

We have previously held that the offense of possession with intent to distribute merged with the completed offense of distribution where both charged offenses [under 21 U.S.C. § 841(a)] were based upon a single transaction. *United States v. Merlino*, 595 F.2d 1016, 1020 (5th Cir.1979); *United States v. Hernandez*, 591 F.2d 1019 (5th Cir.1979). There we held that consecutive sentences constituted double punishment and remanded for resentencing. *See also United States v. Phillips*, 664 F.2d 971, 1039 (5th Cir.1981). Since then, the Supreme Court has held in a different factual context that because of potential adverse collateral consequences, separate convictions may not be allowed where separate sentences are impermissible under *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). *Ball v. United States*, 470 U.S. 856, 105 S.Ct. 1668, 1671–74, 84 L.Ed.2d 740 (1985). Both counts 5 and 7 are based upon the same conduct on the part of appellant: his

assisting in loading the airplane that transported the marihuana from Belize to Texas on December 8, 1981. Because we vacate appellant's conviction under count 5 on other grounds, *infra*, part II, G, we need not determine whether the offenses under counts 5 and 7 merge, or whether *Hernandez* or *Blockburger* and *Ball* apply here. We hold that appellant was properly convicted under count 7.

### D. *Did mid-trial publicity taint jury deliberations?*

We now move to appellant's more substantial contentions. He claims that the jury may have seen what he characterizes as a highly prejudicial news article about him prior to or in the course of its deliberations, and the district court erred by failing to caution the jury adequately to disregard press accounts. He urges error also in the court's denial of his motion for leave to interview jurors about the press publicity and his motion for a new trial based upon the stories in the press.

July 14, 1986, was the day the jury heard final arguments and began its deliberations. That morning, the *Dallas Times Herald* published a front-page story concerning the trial which included the following sentence on the continuation page (p. 8A):

> Zabaneh's arrest in November 1985 followed a series of debriefings with informants who told DEA agents that Zabaneh and his family were responsible for one-third to one-half of all the drugs smuggled into the United States from Belize—a total of about 100,000 pounds of marijuana and 3,000 kilograms of cocaine since 1978, according to court documents.

Jury deliberations continued until a verdict was reached the next day. Appellant suggests that jury members could have been exposed to the *Times Herald* article sometime between its publication and the time they rendered their verdict. The court did not admonish the jury on either July 14 or July 15. On July 21, six days after the verdict was rendered, appellant filed motions for leave to interview jurors, for an extension of time for filing a motion for a new trial to permit inquiry as to whether any of the jurors had read the article, and for a new trial. All were denied on July 22. Appellant cites numerous Fifth Circuit cases holding that a party claiming the jury was improperly influenced must be given opportunity to prove that claim, *see e.g., United States v. Forrest*, 620 F.2d 446, 457 (5th Cir.1980), *United States v. Capo*, 595 F.2d 1086, 1093 (5th Cir.1979), and particularly, *United States v. Herring*, 568 F.2d 1099 (5th Cir.1978). Further, as part of the opportunity to prove the claim, the trial judge must question jurors about their exposure to prejudicial publicity, *see e.g., United States v. Attell*, 655 F.2d 703, 705 (5th Cir.1981).

■ Taken out of context, the quoted sentence from the *Dallas Times Herald* could well be considered prejudicial. The article as a whole, however, appears sympathetic to appellant in that it focuses on the point that he was being prosecuted despite what it repeatedly calls his "unlawful" or "illegal arrest."[4] We are not persuaded that the article as a whole would have so prejudiced the jury against appellant, had they read it, that a specific admonishing of the jury was necessary with respect to this particular article.

The district court had admonished the jury against exposure to outside information on July 7, the first day of trial: "You ... may not consider any sources of information not presented to you in this court.... [D]o not read or listen to anything touching on this case in any way." The record does not show that the court again cautioned the jury not to read about matters involved at trial. It might have been better to have done so. But it also might have been better, as a matter of discretion, not to call attention specifically to the article. Appellant adduces no theory

---

**4.** The headlines on pages 1A and 8A read as follows: "Legal twist holds suspect captive," "Drug-smuggling trial continues despite unlawful arrest by DEA," and "Arrest unlawful but allowed." The magistrate had found that at the time appellant was apprehended in Guatemala, DEA agents did not have authority to arrest him.

or evidence to support his intimation that the significance of the court's July 7th admonishment was lost upon the jury simply because the court did not repeat it later.

■ Moreover, appellant effectively waived his right to raise the issue of possible jury prejudice. Appellant concedes that he became aware of the newspaper article on July 14 at least while the jury was deliberating and perhaps before argument and instructions were completed. Yet, he waited nearly a full week before bringing the matter to the court's attention. He thereby relinquished the opportunity to have the court make further timely admonishment or jury inquiry. By this delay, appellant had substantially impaired the court's ability to conduct a meaningful inquiry into possible prejudice before the jury verdict or immediately after. Following release from jury service, the jurors were instructed that they were no longer bound by the court's instructions. They were then free to read or view any material pertaining to the trial which they previously would have been forbidden to examine. The delay thus served to reduce prospects for an accurate inquiry regarding what information members of the jury might have learned, when they might have learned or been exposed to it, and whether it had influenced their thinking about the questions before them.

The cases cited by appellant to support his contention that the court should have granted his motions for leave to interview jurors and for new trial all involve situations where the defendant raised the issue of possible prejudicial publicity during trial or during jury deliberations, when the court could have readily conducted an inquiry of the jury. Recently, in *United States v. Birdsell*, 775 F.2d 645 (5th Cir. 1985), *cert. denied*, 476 U.S. 1119, 106 S.Ct. 1979, 90 L.Ed.2d 662 (1986), we addressed the kind of situation where the issue of possible prejudicial publicity was raised *after* the jury returned its verdict:

> [Appellant] also asserts that the district court failed to safeguard the impartiality of the jury when it failed to ascertain whether the jury had read or been influenced by an allegedly prejudicial article which appeared in a local newspaper on the second day of trial. The record reflects that defense counsel never raised the issue of prejudicial trial publicity. In introductory instructions, the court cautioned the jury that they must "not consider anything [they] may have read or heard about the case outside of the courtroom whether before or during the trial." [Appellant] has alleged no facts from which this Court could conclude that any of the jury members even read the article. Accordingly, he has shown no plain error in the trial court's failure to question the jurors about the newspaper article.

*Id.* at 652–53.

In summary the newspaper account was not clearly prejudicial, the court had properly admonished the jury against reading extrinsic information, and appellant knew of the article during jury deliberations but waited six days after the verdict was announced to raise the question of possible jury prejudice. We hold that the district court did not commit error by failing to repeat its admonition or abuse its discretion by denying appellant's post-trial motions relating to possible jury prejudice.

### E. Venue (Counts 1, 2, and 3)

■ Appellant urges that his conviction on counts 1, 2, and 3 must be set aside because the district court erred in refusing to dismiss them for improper venue in the Northern District of Texas. These first three counts are all based in part on 21 U.S.C. §§ 955a or 959. Both sections include the following venue provision:

> Any person who violates this section shall be tried in the United States district court at the point of entry where such (§ 959) [or "that" (§ 955a)] person enters the United States, or in the United States District Court for the District of Columbia.

Section 955a(f), [now 46 U.S.C. § 1903(f)] and § 959(c). Appellant argues that the "shall" language here is mandatory and bars jurisdiction by courts situated elsewhere. The district court denied his mo-

tion to dismiss on the basis of jurisdiction. The Government relies, instead, on the venue provision in 18 U.S.C. § 3237(a):

> Except as otherwise expressly provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Appellant urges that since he entered the United States at Houston, venue lies in either the Southern District of Texas or the District Court for the District of Columbia.[5]

The core question here is whether the venue provisions of §§ 955a and 959 were intended to be exclusive. The "shall" language might so imply, but 18 U.S.C. § 3237(a) establishes venue as indicated except as otherwise *expressly* provided. *United States v. Hankish*, 502 F.2d 71 (4th Cir.1974), dealt with the question whether "shall" venue language in a stolen goods statute (18 U.S.C. § 659) defeated venue under § 3237. There the court held that the venue provision in the former was not intended to be an express exception to the provisions of § 3237. *Id.* at 73. Section 659 provided:

> [T]he offense shall be deemed to have been committed in any district into which such [stolen goods] shall have been removed or into which the same shall have been brought by the offender.

*Id.* at 73.[6] The court found that this venue provision was not "couched in restrictive language," unlike 18 U.S.C. § 1073, which reads: "Violations of this section may be prosecuted *only* " in the specified district. *Id.*

There is significant difference between the phrases "shall be tried" and "may be prosecuted only." We have previously held that another statute with "shall" language, 18 U.S.C. § 3238, is not to be construed as an express exception to the broad provision

for venue under § 3237(a). *United States v. Williams*, 589 F.2d 210, 213 (5th Cir. 1979). The same reasoning applies here to uphold venue under § 3237(a). In addition, a member of an alleged conspiracy may be tried in any district where an overt act takes place, even if he has "never set foot" there. *United States v. Parrish*, 736 F.2d 152, 158 (5th Cir.1984); *United States v. Winship*, 724 F.2d 1116, 1125 (5th Cir. 1984). Count 1 charges conspiracy. Venue for counts 2 and 3 is specifically based upon 18 U.S.C. § 3237.

We hold that the district court did not err in denying appellant's motion to dismiss counts 1, 2, and 3 for improper venue.

### F. *Merger of offenses rather than consecutive sentences under §§ 955a and 959 (Counts 2 and 3).*

Appellant contends that he was improperly sentenced to consecutive sentences for his convictions under counts 2 and 3, since both were based on a single transaction, *viz.,* the shipment of a quantity of marihuana to Texas on December 8, 1981. Count 2 was grounded on 21 U.S.C. § 955a(d)(1), possession with intent to import; count 3 was based on 21 U.S.C. § 959(a)(1), distribution with intent to import. Appellant urges that it is unclear whether Congress intended to punish these offenses separately, and cites *Bell v. United States*, 349 U.S. 81, 83–84, 75 S.Ct. 620, 622, 99 L.Ed. 905 (1955) for the proposition that "doubt [should] be resolved against turning a single transaction into multiple offenses" (the "principle of lenity"). He suggests that this Court is bound by our en banc decision in *United States v. Hernandez*, 591 F.2d 1019, 1022 (5th Cir.1979), in which we held that when the defendant sold heroin on a single occasion the offenses of possession with intent to distribute and distribution of drugs in violation of 21 U.S.C. § 841(a)(1) merged into a single punishable offense.

Appellant cites numerous Circuit Court of Appeals decisions, including three by

---

5. During trial, appellant also contended that venue should have been in Louisiana, since the December 1981 aircraft carrying marihuana first entered the United States over that state!

6. The language quoted appears to be a substantially accurate paraphrase of 18 U.S.C. § 659, ¶ 6.

this Court,[7] holding that where a single act formed the basis for charges of both possession of a controlled substance with intent to distribute and distribution of the same, only one sentence may be imposed. Appellant argues that even if he might be prosecuted for both offenses, he may be sentenced only for one of them under the Supreme Court's holding that separate punishments may be imposed for multiple offenses arising in the course of a single transaction only when "each [statutory] provision requires proof of an additional fact which the other does not," *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). *See also Ball v. United States*, 470 U.S. 856, 105 S.Ct. 1668, 1672, 84 L.Ed.2d 740 (1985). His claim is that possession of marihuana with intent that it be imported does not require proof of any element not also required to prove distribution of marihuana with intent that it be imported.

We conclude that *Blockburger, Hernandez*, and their progeny do not control separate punishment under counts 2 and 3 because we find in the record distinct and separate evidence with respect to each offense. We explicitly noted in *Hernandez* that our opinion there did "not concern the situation where there is separate evidence of possession with intent to distribute and evidence of distribution in one or more different transactions." 591 F.2d at 1022. Since then, we have regularly held that consecutive sentences may be imposed for possession with intent to distribute and for distribution when there is independent evidence of the defendant's prior possession of the controlled substance before the actual time of the distribution, or when there is other separate evidence for each offense. *United States v. Hernandez*, 750 F.2d 1256, 1259–60 (5th Cir.1985); *United States v. Berkowitz*, 662 F.2d 1127, 1140–42 (5th Cir.1981); *United States v. Colmenares-Hernandez*, 659 F.2d 39, 43 (5th Cir.1981); *United States v. Rodriguez*, 612 F.2d 906, 920–23 (5th Cir.1980) (en banc) *aff'd sub*

*nom. Albernaz v. United States*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); *United States v. Foundas*, 610 F.2d 298, 301–02 (5th Cir.1980). *See also Gore v. United States*, 357 U.S. 386, 392, 78 S.Ct. 1280, 1284, 2 L.Ed.2d 1405 (1958).

■ There is record evidence on the basis of which the jury could have concluded that appellant or his co-conspirators accumulated marihuana for some period prior to December 8, 1981, the date it was flown from Belize to Texas. This evidence establishes prior possession with intent to distribute, separate and apart from the eventual actual distribution. *See Berkowitz*, 662 F.2d at 1141 n. 16. Record evidence shows that on December 8, 1981, appellant participated in the distribution by being involved in the process of loading the marihuana onto the aircraft destined for the United States. The district court did not err in upholding appellant's convictions on the separate counts of possession with intent to distribute [§ 955a(d)(1)] and distribution with intent to import [§ 959(a)(1)] or by sentencing him to consecutive five-year terms for each offense.

*G. Conviction and consecutive sentences where one count includes the other (counts 5 and 6)*

■ Appellant contends that his convictions under 21 U.S.C. §§ 952(a) [count 5] and 957 [count 6] cannot both be sustained because they describe identical offenses. He contends further that he may not be subjected to consecutive sentences for each conviction, without transgressing the Fifth Amendment's double jeopardy clause.

Section 952(a) makes it unlawful to import into the United States various scheduled controlled substances. Section 957(a) makes it unlawful for any person to import into the United States most of the same scheduled controlled substances,

> unless there is in effect with respect to such person a registration issued by the Attorney General under section 958 of

---

7. *United States v. Phillips*, 664 F.2d 971, 1039 (5th Cir.1981) (possession with intent to distribute and distribution in violation of § 841(a)); *United States v. Merlino*, 595 F.2d 1016, 1020 (5th Cir.1979) (possession with intent to distribute and distribution in violation of a single subparagraph under § 841(a)); and *Hernandez*, 591 F.2d at 1021–22.

this title, or unless such person is exempt from registration under subsection (b) of this section.

*Id.* Appellant insists that consecutive sentences may not be imposed for these separate counts under the *Blockburger* standard, which, as we pointed out above, requires proof of some different fact in support of each offense when multiple offenses arise out of the same transaction. *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182. Appellant buttresses his contention by urging that the Supreme Court has subsequently re-affirmed *Blockburger,* holding that consecutive terms are permissible only on a clear indication of legislative intent so to provide:

> The assumption underlying the [*Blockburger*] rule is that Congress ordinarily does not intend to punish the same offense under two different statutes. Accordingly, where two statutory provisions proscribe the "same offense," they are construed not to authorize cumulative punishments in the absence of a clear indication of contrary legislative intent.

*Whalen v. United States,* 445 U.S. 684, 692–93, 100 S.Ct. 1432, 1437–38, 63 L.Ed.2d 715 (1980). More recently, the Supreme Court has re-affirmed that the *Blockburger* test is a "rule of statutory construction" as a means of discerning legislative purpose and, therefore, should not control where "there is a clear indication of contrary legislative intent." *Albernaz v. United States,* 450 U.S. 333, 340, 101 S.Ct. 1137, 1143, 67 L.Ed.2d 275 (1981). *See also Garrett v. United States,* 471 U.S. 773, 105 S.Ct. 2407, 2412, 2419–20, 85 L.Ed.2d 764 (1985); *Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 678–79, 74 L.Ed.2d 535 (1983).

The crucial question here, therefore, is whether Congress intended to create separate punishable offenses in §§ 952(a) and 957(a) for a single episode. Both appellant and the Government concede that the legislative history is inconclusive. It is clear that Congress enumerated separate offenses, importation and importation with-

out a requisite registration, under two separate sections of the Comprehensive Drug Abuse Prevention and Control Act of 1970. But both offenses were made punishable under 21 U.S.C. § 960, which reads:

#### Unlawful Acts

(a) Any person who—

> (1) contrary to section 952, 953, or 957 of this title, knowingly or intentionally imports or exports a controlled substance, ...

shall be punished as provided in subsection (b) of this section.

#### Penalties

(b)(1) In the case of a violation under subsection (a) of this section with respect to a narcotic drug in schedule I or II, the person committing such violation shall be imprisoned not more than fifteen years ...

21 U.S.C. § 960(a)(1) and (b)(1).

We note that Congress did not refer to the possibility that more than one violation might be found under subsection (a), which subsection provides that a person who intentionally imports contrary to section 952 *or* section 957 shall be punished as provided in subsection (b). It could be that Congress simply overlooked such a possibility. On the other hand, if Congress had intended that offenses under §§ 952 and 957 were to be subject to separate penalties, it could have readily so indicated by drafting § 960(b)(1) to read: "In the case of a violation or violations under subsection (a) of this section ..., the person committing such violation or violations shall be imprisoned not more than fifteen years for each violation ..." It did not do so. We cannot conclude from the bare language of sections 952, 957, and 960 that Congress manifested clear legislative intent to authorize separate punishments for the offenses of importing and importing without a requisite registration when both occurred in a single transaction. *Blockburger* therefore controls. *Albernaz,* 450 U.S. at 340, 101 S.Ct. at 1143;[8] *Whalen,* 445 U.S. at 692–93, 100 S.Ct. at 1437–38.

---

**8.** The present case is distinguishable from *Alber-* *naz* in certain important respects. In *Albernaz*

As noted above, the Supreme Court held in *Blockburger* that separate punishments may be imposed for multiple offenses arising out of the same transaction only when each offense requires proof of an additional fact which the other does not. *Albernaz,* 101 S.Ct. at 1141–42; *Whalen,* 100 S.Ct. at 1437; *Blockburger,* 52 S.Ct. at 182. We cannot perceive, nor has the Government brought to our attention, any additional fact required to prove that appellant imported marihuana into the United States [§ 952(a)], which fact is not also required to prove that he imported the same marihuana into the United States without a requisite registration issued by the Attorney General [§ 957(a)]. Consecutive sentences on counts 5 and 6 are therefore impermissible under *Blockburger,* since each offense does not require "proof of an additional fact which the other does not." *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182.

The Government's only answer to the application of *Blockburger* is that it does not come into play when it is clear that Congress intended to create two wholly separate offenses. But the only proof of such intent put forth is that they are both contained in the statute. If this analysis were to prevail, there would be no *Blockburger* principle. To thwart *Blockburger* there must be a specific and clear showing that Congress intended the two different offenses to arise independently in a single transaction situation. We find no such manifestation of Congressional intent.

In *Ball v. United States,* 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985), the Supreme Court addressed the implications of *Blockburger* where a defendant had been subjected to two convictions and consecutive sentences for the single transaction of receiving and possessing the same firearm. The Court held that the defend-

ant could be prosecuted for both offenses, but could only be convicted and sentenced for one, and remanded to the district court to vacate one of the convictions. The Court concluded that Congress had not intended to subject persons in such situations to two convictions since "proof of illegal receipt of a firearm *necessarily* includes proof of illegal possession of that weapon. '[W]hen received, a firearm is necessarily possessed.'" *Id.,* 105 S.Ct. at 1672. Here, the offense of importation without requisite registration (count 6) *necessarily* encompasses the offense of importation (count 5). *Ball* requires vacating appellant's conviction on either count 5 or count 6. Vacating the conviction on count 5 is the proper choice because it removes any concern as to the relationship between counts 5 and 7.[9] We therefore vacate the count 5 conviction. Because we resolve this issue on the basis of statutory construction, we do not reach the Constitutional question concerning possible double jeopardy.

## H. *Sixth Amendment right to compulsory process and prosecutor's argument against absent witnesses' credibility*

Appellant complains that although the penal statute under which he was convicted provided for extra-territorial application, he was not afforded extra-territorial service of compulsory process. He had subpoenas issued and served on twelve witnesses in Belize, but only three of them appeared at trial. His first contention in this connection is that he was denied his Sixth Amendment right to compulsory process.[10]

This question is one of first impression in the Fifth Circuit. It is well established, however, that convictions are not unconstitutional under the Sixth Amendment even though the United States courts lack power

(1) the defendant had been accused of clearly different offenses, *viz.,* conspiracy to *distribute* marihuana, and conspiracy to *import* it; (2) the offenses were specified in separate subchapters of the Act; and (3) each had separate penalty provisions, *viz.,* 21 U.S.C. §§ 846 and 963. In the case at hand, (1) the offenses both have to do with illegal importation; (2) the provisions are in proximate sections of the same subchap-

ter; and (3) both are punishable under the same section, *viz.,* § 960.

9. *See supra* under part II, C of this opinion.

10. "In all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor ..." U.S. CONSTITUTION, Amend. VI.

to subpoena witnesses, (other than American citizens) from foreign countries. *United States v. Greco*, 298 F.2d 247, 251 (2d Cir.), *cert. denied* 369 U.S. 820, 82 S.Ct. 831, 7 L.Ed.2d 785 (1962); *United States v. Wolfson*, 322 F.Supp. 798, 819 (D.Del.1971), *aff'd* 454 F.2d 60 (3d Cir.), *cert. denied*, 406 U.S. 924, 92 S.Ct. 1792, 32 L.Ed.2d 124 (1972); *United States v. Hofmann*, 24 F.Supp. 847, 848 (S.D.N.Y.1938).

■ Appellant also contends that the district court erred by allowing the prosecutor, over objection, to read to the jury portions of the depositions of five of the absent witnesses indicating their unwillingness or in some instances their claimed inability to come to the United States to testify at trial. Appellant implies that he was prejudiced by the court's allowing the jury to hear these statements, and that if the witnesses had been compelled to appear so that the jury could have seen them, it would have taken a more positive view of their credibility and their exculpatory depositions on his behalf. The Government's position is that it was entitled to draw the jury's attention to the witnesses' statements respecting their inability or unwillingness to come to the United States so that the jury might draw its own conclusions concerning their credibility. We find the Government's position persuasive. Appellant may not offer only those portions of his witnesses' depositions that he finds favorable, and censor or bar admission of portions that might undermine the same witnesses' credibility.

■ Finally, appellant complains that the prosecutor suggested to the jury in closing argument that these five Belizian deponents were not worthy of belief because of their unwillingness to come to the United States to testify. The prosecutor's statement was as follows:

I would submit to you that you are entitled to consider their refusal to come here and look you in the eye and tell you what they told you during these depositions. You are entitled to weigh that

when you're trying to decide how much weight to give to their testimony. Every one of them I tried to ask if they would come to the United States and give this testimony for your benefit, so you could look at them and judge them like any other witness so that you would have the opportunity to see them, see their demeanor, see their facial impressions [*sic*], hear the inflexion in their voice and he[ar] directly from them what their testimony was. Not a single one of them would come up here and do that.[11] And you know they all had an excuse, and you have to decide for the benefit of yourself whether you think those excuses are valid or if there is some other reason that they wouldn't come up here. I have to take my medication. You can bring it with you. Well, I don't want to leave the country. You refuse to leave. Yeah, that's right. My boss, I'm not sure he'll let me go. Have you asked him? No. Do you intend to ask him? No. Every single one of them. Is that a coincidence that every single one of these people refused to come or do you believe there is some similarity there that's more than just a coinciden[ce]?

Appellant neither objected to nor asked the court to instruct the jury to disregard the prosecutor's statement. To prevail without the objection there must be a showing of plain error on the part of the district court. Appellant does not contend that the court committed plain error, and we do not find plain error in permitting the prosecutor's argument.

■ We conclude that appellant was not denied a constitutionally protected right of compulsory process, in that such right does not ordinarily extend beyond the boundaries of the United States; that the court properly allowed the jury to hear the absent witnesses' sworn statements indicating their unwillingness to come to the United States to testify; and that appellant cannot now be heard to object to the Government's closing statement advising

---

**11.** As earlier stated, three witnesses from Belize did appear at the trial and testify for defendant. There were also others who had plausible excuses for not coming to the trial. The prosecutor evidently was focusing upon five who refused to come or had implausible excuses.

the jury to consider these witnesses' statements and their absence in deciding how much weight to give to their depositions.

### I. *Jurisdiction over appellant allegedly acquired by kidnapping and in violation of law and treaties*

The Government denies that its agents participated in the asserted kidnapping, other than as observers. The district court made no finding that Government agents were involved. Appellant does acknowledge that even though American officials kidnap a criminal defendant from a foreign jurisdiction, a federal district court has jurisdiction to try him if his extraterritorial acts were intended to have effect in the United States, unless governmental conduct is so "outrageous" or "shocking to the conscience" as to constitute a deprivation of the defendant's Fifth Amendment due process rights. *Frisbie v. Collins*, 342 U.S. 519, 72 S.Ct. 509, 511–12, 96 L.Ed. 541 (1952); *Ker v. Illinois*, 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886); *United States v. Postal*, 589 F.2d 862, 874 n. 17, 885 (5th Cir.1979); *United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 64–66 (5th Cir.1975); *United States v. Herrera*, 504 F.2d 859, 860 (5th Cir.1974). *See also Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975).

■ Appellant urges that international treaties which provide for extradition of foreign nationals deprive the courts of the United States of jurisdiction over individuals and property that would otherwise be subject to their jurisdiction, citing *Postal*, 589 F.2d at 874–75. In proceedings below, the magistrate determined that although certain treaties existed between the affected nations, neither the government of Guatemala nor that of Belize had filed protest or complained as to the facts or circumstances with respect to appellant's apprehension. Treaties are contracts between or among independent nations. The treaty provisions in question were designed to protect the sovereign interests of nations, and it is up to the offended nations to determine whether a violation of sovereign interests occurred and requires redress. *Whitney v. Robertson*, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888); *Postal*, 589 F.2d at 875; *United States ex rel. Lujan v. Gengler*, 510 F.2d at 67. Because neither Guatemala nor Belize protested appellant's detention and removal to the United States, appellant lacks standing to raise the treaties as basis for challenging the court's jurisdiction.[12]

■ Appellant also claims that the Government violated the so-called Mansfield Amendment, 22 U.S.C. § 2291(c)(1) which then read in relevant part:

> Notwithstanding any other provision of law, no officer or employee of the United States may engage or participate in any direct police arrest action in any foreign country with respect to narcotic controlled activity.

Even if the district court had found that government agents were involved in appellant's arrest in Guatemala, Congress has not provided sanctions or penalties by way of relief for persons arrested in contravention of § 2291(c)(1). We conclude that the district court had jurisdiction to try appellant under the indictment charged, even if he was abducted by government agents or others from Guatemala to the United States.

### J. *The requirement of Beechum-Robinson determinations*

■ The most serious issue in this case is appellant's contention that the jury was permitted, over objection, to hear testimony by three witnesses as to several instances of drug smuggling by appellant which were not included in the indictment without a prior *Beechum-Robinson* determination that such testimony was admissible.[13] Appellant argues that this testimony was prejudicial, and that the district court erred by overruling his repeated timely objections and by failing to make the *Beechum-Rob-*

---

**12.** *See United States v. Cadena*, 585 F.2d 1252, 1260–61 (5th Cir.1978); *Gengler*, 510 F.2d at 66–67.

**13.** This issue was not mentioned at oral argument. But it was considered in the briefs and, thus, is not waived.

*inson* prior determinations with respect to the admissibility of such testimony.

In *United States v. Beechum,* 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979), we spell out a two-step analysis based upon Rule 403, Fed.R.Evid., for determining the admissibility of evidence of extrinic offenses under Rule 404(b), Fed.R. Evid.

> First, it must be determined that the extrinsic offense evidence is relevant to an issue other than the defendant's character. Second, the evidence must possess probative value that is not substantially outweighed by its undue prejudice and must meet the other requirements of Rule 403.

*Id.* at 911. In *United States v. Robinson,* 700 F.2d 205, 213 (5th Cir.1983), we further held that on-the-record findings by the trial court as to its *Beechum* probative value/prejudice conclusions were required when requested by a party. Failure to make such findings necessitates remand "unless the factors upon which the probative value/prejudice evaluation were made are readily apparent from the record, and there is no substantial uncertainty about the correctness of the ruling." *Id.* This record reveals that there was substantial uncertainty which the court itself recognized.

A thorough reading of the record shows that the district court failed to articulate its findings on the record with respect to extrinsic offenses, as mandated in *Beechum* and *Robinson,* either prior to admitting the challenged testimony, or afterwards. Despite the fact that appellant, through counsel, repeatedly drew the district court's attention to this Court's *Beechum-Robinson* standards before and during the course of trial, the court indicated doubt about the continuing vitality of the *Beechum* analysis and apparently remained unconvinced as to the *Robinson* requirement that it articulate its *Beechum* probative value/prejudice findings *when requested.* [14]

### The Beechum-Robinson Requirements

 *Beechum* held that the court must first determine that the extrinsic offense evidence is relevant to an issue other than the defendant's character. 582 F.2d at 911. In doing so, the court must address initially the threshold question whether the defendant committed the alleged extraneous offense.

> Obviously, the line of reasoning that deems an extrinsic offense relevant ... is valid only if an offense was in fact committed and the defendant in fact committed it. Therefore, as a predicate to a determination that the extrinsic offense is relevant, the Government must offer proof demonstrating that the defendant committed the offense. If the proof is

**14.** Over a month and a half before trial, appellant filed a motion in limine with the district court asking for an order "prohibiting the Government from presenting in front of the jury any ... alleged acts or conduct which would only be arguably admissible under Rule 404(b) of the Federal Rules of Evidence without first holding a hearing outside the presence of the jury to determine admissibility under the guidelines as set out in *United States v. Beechum.*" The court denied the motion at the beginning of trial citing our holding in *Jackson v. Firestone,* 788 F.2d 1070, 1075 (5th Cir.1986), as authority for the proposition that "it's reversible error to grant motions in limine." *Jackson* was a civil (products liability) case that had nothing to do with extrinsic offense evidence or rules 404(b) or 403. The district court erred in reading *Jackson* to overrule or supercede *Beechum* and *Robinson.*

Appellant then objected on the basis of *Beechum* to the first Government witness's testimo-

ny as to a series of alleged extrinsic offenses in 1980 and early 1981. On each of the first two days of trial, the court told counsel that it would rather take a chance on a mistrial than take time to hear Rule 404(b) evidence outside the presence of the jury.

We have not receded from either *Beechum* or *Robinson. See, e.g., United States v. Henthorn,* 815 F.2d 304, 307–08, (5th Cir.1987); *United States v. Merkt,* 794 F.2d 950, 962–63 (5th Cir.), *cert. denied,* ─── U.S. ───, 107 S.Ct. 1603, 94 L.Ed.2d 789 (1986). *See also United States v. Williams,* 816 F.2d 1527, 1531 (11th Cir.1987) (following *Beechum* ); *United States v. Acosta,* 763 F.2d 671, 695–96 (5th Cir.), *cert. denied sub nom. Weempe v. United States,* 474 U.S. 863, 106 S.Ct. 179, 88 L.Ed.2d 148 (1985) (remanding for failure to make mandatory probative/prejudice determination under rule 609); *United States v. Lavelle,* 751 F.2d 1266, 1279–80 (D.C.Cir.), *cert. denied,* 474 U.S. 817, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985) (following *Robinson* ).

insufficient, the judge must exclude the evidence because it is irrelevant.

*Id.* at 912–13. To be sure, the court need not be convinced beyond a reasonable doubt that the defendant committed the extrinsic offense, nor need the court require the Government to come forward with clear and convincing proof.[15] Rather, the standard for the admissibility of extrinsic offense evidence is that of Rule 104(b): "the preliminary fact can be decided by the judge against the proponent only where the jury could not reasonably find the preliminary fact to exist." *Id.* at 913. Nevertheless, it is requisite under *Beechum* that the court *make* this threshold determination out of the presence of the jury before making its determination as to whether the extrinsic offense evidence is relevant.[16] The record indicates that the court did not do so with respect to any of the testimony presented as to the alleged extrinsic offenses prior to deciding relevance and allowing the testimony to come before the jury.[17]

■ As to the question of relevance, the district court did make a latish determination—after permitting a substantial part of the testimony to go to the jury—that the extrinsic offense testimony offered by Mr. Tonjes, the Government's first witness, was relevant or probative as to issues other than the defendant's character. The testimony was found to be relevant to appellant's identity and also to showing a scheme or plan. Later in the trial, the court also determined (after the close of the Government's case-in-chief) that the extrinsic offense testimony of two other witnesses was relevant as to appellant's identity, his intent to import marihuana illegally into the United States, and the ongoing relationship of various persons involved tending to prove a plan or scheme. The court failed, however, to undertake this step-one *Beechum* determination when requested by appellant during the government's case and prior to admitting the challenged testimony of the two witnesses as required by *Robinson,* 700 F.2d at 213. Instead, when appellant objected to such testimony and requested the requisite *Beechum* determination, the court overruled the objections and allowed the testimony to continue.[18] But since the court had already determined the relevance of the extrinsic offenses testimony when considering that issue in relation to the first witness, we are not particularly concerned about this part of the *Beechum* requirement. The error was harmless.

■ The critical issue raised by this record is the court's failure to undertake the second step mandated by *Beechum* with respect to admissibility of extrinsic offense evidence. The trial court must determine that the proffered evidence possesses probative value that is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, and oth-

---

15. Both the Government and appellant erroneously asserted at trial that the requirement was clear and convincing proof. We abandoned that standard when we specifically overruled *United States v. Broadway,* 477 F.2d 991 (5th Cir.1973) in *Beechum,* 582 F.2d at 910. *See United States v. Lemaire,* 712 F.2d 944, 946–47 (5th Cir.), *cert. denied,* 464 U.S. 1012, 104 S.Ct. 535, 78 L.Ed.2d 716 (1983).

16. *United States v. Jardina,* 747 F.2d 945, 952 (5th Cir.1984); *United States v. Lemaire,* 712 F.2d at 946–47; *United States v. Guerrero,* 650 F.2d 728, 733–34 (5th Cir.1981).

17. After the close of the Government's case, the district court did rule, belatedly and perfunctorily, that the Government had offered sufficient proof: "Very well. On the basis of the defense's request, I will find that the government has made a sufficient showing under Rule 104(b) of

the Federal Rules of Evidence that the defendant here, Angel Johnnie Zabaneh, committed the acts which I have admitted under 404(b) of the Federal Rules of Evidence."

18. In response to appellant's objection concerning testimony by one of the witnesses, the court stated: "Well, I'm concerned about the defendant's objection. But I think since we have gone this far we might as well go ahead and hear the witness'[s] testimony. So I am going to overrule the objection.... I think we've gone so far that there is not that much additional harm to hear him out." The court responded to appellant's requests for a *Beechum* determination as to the other witness's extrinsic offense testimony simply by overruling the objections without explanation.

er requirements of Rule 403.[19] Under *Beechum,* the court's weighing of Rule 403 considerations is mandatory. The requirement is that the *Beechum* probative value/prejudice inquiry must be articulated on the record when requested by a party. *Robinson,* 700 F.2d at 213. Although requested, the court failed to articulate its assessment of the probative value as against the prejudicial harm of allowing Tonjes's extrinsic offense testimony to go to the jury. Instead, the court simply announced, "I have made the balancing judgments that are called for in the *Beechum* opinion at pages 909 to 915." The court also made no on-the-record assessment of probative value/prejudicial harm in connection with the prospective testimony of the other two witnesses, since it simply overruled appellant's timely requests for such determination.[20]

At the close of the Government's case-in-chief, the court partially addressed appellant's request for a *Beechum* determination of the probative value of the extrinsic offense testimony as against its potential prejudice. The court still did not undertake, however, to balance these considerations on the record. Instead, it construed *Beechum* to mean that in weighing proba-

tive value against potential prejudice the extrinsic evidence must be so prejudicial that it will inflame the jury's passions.[21] The court concluded,

> I am not able to say on the basis of what I have heard here that I think the jury is likely to have its passions inflamed by the evidence that has come in concerning these other transactions.

The district court also incorrectly stated that we had held in *Beechum* that any problems resulting from the admission of 404(b) evidence could be handled by cautionary or limiting instructions to the jury.[22]

The district court did not fully meet the requirements of our holdings in *Beechum* and *Robinson.* Once it has been determined that the extrinsic offense evidence is relevant under Rule 404(b), we have said that the evidence can be admitted unless it is substantially outweighed by prejudicial factors. The court must *determine,* however, whether the prejudicial effect of the proposed evidence outweighs its probative value. *Robinson,* 700 F.2d at 213; *Beechum,* 582 F.2d at 911. To do so, the court must *identify* and *weigh* the po-

19. *Beechum,* 582 F.2d at 911. Fed.R.Evid. 403 reads: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

20. During trial, the Government advised the court that it was unnecessary for the court to make *Beechum* determinations as to testimony by the two witnesses on the theory that it had already made such a determination as to the extrinsic *offenses* testified to by Tonjes. This advice was incorrect. Apart from the fact that the court had *not* made an adequate *Beechum-Robinson* determination as to Tonjes' testimony, the Government confused offenses with testimony about them. The introduction of further testimony by other witnesses as to the alleged extrinsic offenses could have implicated any or all of the considerations enumerated in rule 403, from unfair prejudice through needless presentation of cumulative evidence. See note 19 *supra.*

21. "First it seems to me that *Beechum* itself says in the majority opinion and particularly the

footnotes to the majority opinion that the balance is in favor of admissibility under[,] I believe it's Rule 402[,] unless the court determines that the evidence is so prejudicial that it will likely inflame the jury's passions.... [I]t seems to me [that the position of the majority of the Fifth Circuit in *Beechum* was] that the presumption should be in favor of admissibility once Rule 404(b) had been satisfied."

22. "[T]he *Beechum* decision specifically indicates in a footnote—I don't have that opinion before me still, but I believe it was Footnote 15—that this is the kind of problem that can be handled by a cautionary or limiting instruction."

We did not so state in *Beechum.* We did find in *Beechum* that there "the court was careful to allay, *as much as limiting instructions can,* the undue prejudice engendered by the [extrinsic offense] evidence," 582 F.2d at 917, (emphasis added). But after *Beechum,* such limiting instruction may only serve to supplement, not replace, the two-step analysis we spelled out there which is, moreover, to be applied *before* the court allows the evidence in question to come before the jury. *Robinson,* 700 F.2d at 213.

tentially prejudicial effect of the proffered evidence. Of critical importance is the fact that the court unduly restricted the scope and applicability of Rule 403. It is not at all limited to evidence that "will inflame the jury's passions." The step two *Beechum* analysis requires the trial court to determine that the probative value of the extrinsic offense evidence will not be substantially outweighed by its unfair prejudice. Prejudice can result from any of the significant factors set out in Rule 403, of which inflamed passion is only one.[23] *Beechum*, 582 F.2d at 911, 917.

Among the 403 prejudice factors to be weighed, are the dangers of confusion of the issues and misleading the jury. As we stated in *Beechum,*

> One of the dangers inherent in the admission of extrinsic offense evidence is that the jury may convict the defendant not for the offense charged but for the extrinsic offense.... This danger is particularly great where, as here, the extrinsic activity was not the subject of a conviction; the jury may feel that the defendant should be punished for that activity even if he is not guilty of the offense charged.

582 F.2d at 914. *Beechum* also teaches that the risk of prejudice is particularly great when the extrinsic offenses are similar to the crime charged:

> [T]he more closely the extrinsic offense resembles the charged offense, the greater the prejudice to the defendant. The likelihood that the jury will convict the defendant because he is the kind of person who commits this particular type of crime or because he was not punished for the extrinsic offense increases with the increasing likeness of the offense.

*Beechum,* 582 F.2d at 915 n. 20.

Appellant Zabaneh was charged with a number of violations in connection with the importation of just one shipment of marihuana by airplane from Belize to the United States in December, 1981. Three extrinsic offenses described at length by various Government witnesses in the course of the trial consisted of other alleged importations of marihuana by airplane from Belize to the United States. We note various places in the record when it was not clear even to appellant's counsel that the Government was eliciting testimony as to extrinsic offenses until after considerable segments of such evidence had been presented before the jury. A substantial portion of the total volume of testimony before the jury concerned extrinsic offenses. One witness's testimony pertained in its entirety to such an offense. Although denying appellant's motion to strike this testimony, the court expressed concern about the possibility of jury confusion in view of the growing body of such testimony that was coming before the jury:

> MR. ACKERMAN [counsel for appellant]: The only motion I have at the present time is first of all [that] the evidence be stricken for the government's failure to inform the Court it was going to be 404(b) and [thereby] give the Court the opportunity to make the findings [required] by *Beechum,* and I'll again ask for a mistrial.
>
> THE COURT: Well, I'm not ready to do any of that at this point. So I'll overrule those motions at this time. I am concerned about the matter. And I may reconsider it at a later time. Let me ask both parties to be thinking about something that is bothering me now in light of the volume of 404(b) type testimony that we have had from Mr. Tonjes and Mr. Rutherford. We have not read or even summarized the indictment to the jury at this point. So I don't believe they understand at this point that the transactions we have heard so much testimony about are not those transactions charged in the indictment, and somehow we need to communicate that to the jury.

The district court itself commented, following the close of the Government's case, that "only a fraction of the testimony" the

---

**23.** "'Unfair prejudice' within [the context of Rule 403] means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Notes of Advisory Committee on Proposed Rules.

jury had heard specifically related to the offense charged in the indictment.

The court finally did explain to the jury which of the several transactions testified to was the one on which appellant was being tried, but not until after the Government had presented its entire case. Further, in his instructions to the jury upon submission the judge was clear in submitting only the crimes growing out of the single importation. But by the time the Government concluded its case, and again by the time the court instructed the jury, there could have arisen substantial concern as to whether members of the jury could clearly recall which testimony had impressed them as to appellant's guilt or innocence with respect only to the charged offenses. It follows that there was considerable likelihood of prejudice against appellant from the admission of the extrinsic offense testimony. It was not enough for the court to find that the evidence in question would not inflame the jury's passions—which never was an issue in the case—while ignoring the kinds of rule 403 concerns that were relevant to a proper *Beechum* determination.

 In *Robinson*, we concluded that in the absence of an on-the-record articulation of a trial court's *Beechum* probative value/prejudice findings at the time of a party's request we must remand unless the factors upon which the probative value/prejudice evaluation was made were readily apparent from the record and there was no substantial uncertainty about the correctness of the ruling. 700 F.2d at 213. In the present case, we find that the court did not undertake to make the required on-the-record *Beechum* inquiry either before admitting the 404(b) testimony or afterwards, and it is clear that the factors in the evaluation are not readily apparent from the record. The uncertainty in the record requires a remand for further consideration by the trial judge. On remand, the judge must "determine whether the evidence's prejudicial effect outweighed its probative value and, if so, whether there is a reasonable possibility that this evidence affected the outcome of the case. This

determination by the trial court on remand may be readily made, for the judge is cognizant of all necessary facts." *Robinson*, 700 F.2d at 214. The trial court did make careful limiting charges to the jury when the case was submitted. In reaching its conclusions on remand, therefore, the district court should also consider the extent to which its limiting instructions to the jury, both after the close of the Government's case and in its jury charge concerning extrinsic offense evidence already admitted, may have reduced the possible prejudicial impact of that evidence. As in *Robinson*, "[t]he trial judge shall certify to us his findings and conclusions. The record shall be supplemented by the on-the-record determination herein prescribed, and by any materials submitted by the parties to the district court. Following such filing, the clerk will set a schedule for supplementary briefing and the matter will be returned to this panel for disposition." *Id.* at 214 n. 12.

### III. *Conclusions*

We affirm the district court's judgment and sentencing in all but two particulars. Because appellant may not be convicted and sentenced to consecutive terms under counts 5 and 6, we vacate his conviction and sentence on count 5. And we remand, as required by our holdings in *Beechum* and *Robinson*, for a full on-the-record determination of the weight of probative value as compared with possible Rule 403 prejudice resulting from the admission of extrinsic offense testimony.

We emphasize that the district courts should make it a practice whenever a *Beechum* determination is requested, to undertake that determination then and there, as required by *Robinson*, before admitting the challenged 404(b) evidence, so as to avoid the risks of issue confusion, misleading the jury, or other types of Rule 403 prejudice leading to the necessity of subsequent remand or a new trial.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED IN PART.