PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

—————————————

No. 97-2144

—————————————

D. C. Docket No. 92-255-CR-J-10

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
11/16/98
THOMAS K. KAHN
CLERK

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIAM MCALLISTER,

Defendant-Appellant.

—————————————

Appeal from the United States District Court
for the Middle District of Florida

—————————————

**(November 16, 1998)**

Before TJOFLAT, COX and HULL, Circuit Judges.

PER CURIAM:

William MacAllister appeals his conviction for conspiracy to export cocaine in violation of 21 U.S.C. § 963. We affirm.

## I. FACTUAL BACKGROUND

William MacAllister, a resident of Montréal, Québec, was a member of a conspiracy to export cocaine from the United States. In June 1992, MacAllister's coconspirator and codefendant, Paul LaRue, was introduced by telephone to Drug Enforcement Agency (DEA) Special Agent John Burns. Agent Burns was based in Jacksonville, Florida and played the role of a middleman cocaine supplier.

Larue and Agent Burns began to discuss exporting cocaine from the United States to Montréal. Larue was interested in purchasing 5,000 kilograms of cocaine at a price of $12,000 per kilogram. After many phone conversations, and meetings in both the United States and Canada, Agent Burns requested a down payment for the cocaine. LaRue agreed to obtain the money.

On October 9, 1992, LaRue telephoned Agent Burns stating that his financial backer, MacAllister, was with him; Larue then handed MacAllister the telephone. During that conversation, MacAllister indicated that he had a total of five million dollars waiting as payment for the cocaine and invited Agent Burns to come to Montréal to further negotiate the cocaine purchase and delivery.

In late October 1992, MacAllister and LaRue met with Agent Burns and another undercover agent, Ed Dickey, at a bar inside Montréal's Dorval International Airport. At this meeting, MacAllister proposed a new method for transporting the cocaine from the United States into

Canada.[1]  He also made it clear that he, or his organization, would pay for the cocaine within five days of delivery.

From November 1992 through March of 1993, Agent Burns continued to maintain contact with LaRue;[2] however, a temporary impasse existed because of Burns's demand for a down payment.  LaRue urged that they conclude the deal quickly because the demand for cocaine in Montréal was high and MacAllister and others could sell the cocaine very easily.  As a compromise, Burns agreed to a smaller down payment in exchange for a smaller initial cocaine delivery.

On March 10, 1993, Ashley Castenada, a representative of LaRue, traveled to Jacksonville, Florida to inspect the cocaine.  After viewing the cocaine, Castenada called LaRue in Montréal and notified him that it was of a high quality and ready to be transported.  On March 19, 1993, two other coconspirators, Salvatore Cazzetta and Nelson Hernandez, also traveled to Jacksonville and met with Castenada and Agent Burns.  While at a Jacksonville motel, Agent Burns accepted a down payment of $600,000 in Canadian currency from the conspirators.

On March 21, 1993, Agent Burns met with LaRue in Canada to discuss final plans for the delivery of and total payment for the cocaine.  LaRue then accompanied Burns in a drive back across

---

[1]  MacAllister said that he knew a trucker who operated a large tractor-trailer and routinely traveled between the United States and Canada delivering merchandise. He proposed placing the cocaine on wooden crates that could be loaded into the tractor-trailer in Jacksonville, Florida and then delivered unopened to Montréal.  He also indicated that there would be no problem with customs at the border because he had paid off a customs official.

[2]  On November 4, 1992, undercover agent Louis Acevedo spoke with MacAllister on the telephone.  During their conversation, MacAllister discussed his Colombian contacts. Following this conversation, MacAllister did not have any further contact with Agent Burns or the other undercover agents.

the border to Burlington, Vermont. Shortly after arriving in Burlington, authorities arrested LaRue and Castenada and ultimately transported them to Jacksonville for prosecution.

## II. PROCEDURAL HISTORY

MacAllister was charged in a superseding indictment with conspiracy to export cocaine in violation of 21 U.S.C. § 963. Pursuant to a treaty request, Canadian authorities extradited MacAllister, a Canadian citizen, to the United States to stand trial. A jury found MacAllister guilty as charged.

Following his conviction, MacAllister moved to dismiss the indictment, asserting a lack of subject matter jurisdiction; the court denied the motion. The court sentenced MacAllister to a term of 235 months' imprisonment, to be followed by a sixty-month term of supervised release. MacAllister appeals, challenging the district court's denial of his motion to dismiss for lack of subject matter jurisdiction.

## III. ISSUE ON APPEAL

The issue presented is whether 21 U.S.C. § 963 may be applied extraterritorially, and if so, whether its application to MacAllister's case is appropriate.[3] This is a question of statutory interpretation subject to plenary review. *See United States v. Lawson*, 809 F.2d 1514, 1517 (11th Cir. 1987).

## IV. DISCUSSION

---

[3] Whether MacAllister properly preserved this issue for review depends upon whether the issue is accurately characterized as involving subject matter jurisdiction. The Government does not argue that the issue was not properly preserved, so we will proceed to address the merits.

-4-

The general rule is that a conspiracy to violate the criminal laws of the United States, in which one conspirator commits an overt act in furtherance of that conspiracy within the United States, is subject to prosecution in the district courts.[4]  In the case at bar, there was a conspiracy to export cocaine from the United States to Montréal, a violation of § 963.  The conspirators intended to violate the laws of our country by exporting cocaine, a crime under § 953.  The conspiracy was not limited to Canada; MacAllister's coconspirators committed numerous acts in furtherance of the conspiracy within the United States.  Federal criminal statutes may properly include extraterritorial effects.  *United States v. Baker*, 609 F.2d 134, 136 (5th Cir. 1980).  Whether Congress has intended extraterritorial application is a question of statutory interpretation.  *See Foley Bros., Inc. v. Filardo,* 366 U.S. 281, 284, 69 S. Ct 575, 577 (1949); *United States v. Bowman*, 260 U.S. 94, 97, 43 S. Ct. 39, 41 (1922).  In the present case, we ask whether the "language in [§ 963] . . . gives any indication of a congressional purpose to extend its coverage beyond places over which

---

[4]     *See Ford v. United States*, 273 U.S. 593, 620, 47 S. Ct. 531, 540 (1927) ("[T]he conspiring was directed to violation of the United States law within the United States, by men within and without it, and everything done was at the procuration and by the agency of each for the other in pursuance of the conspiracy and the intended illegal importation.  In such a case all are guilty of the offense of conspiring to violate the United States law *whether they are in or out of the country*.") (emphasis added);  *United States v. Inco Bank & Trust Corp.*, 845 F.2d 919, 920 (11th Cir. 1988) ("It is well settled that the government has the power to prosecute every member of a conspiracy that takes place in United States territory, even those conspirators who never entered the United States.");  *Rivard v. United States*, 375 F.2d 882, 886 (5th Cir. 1967) ("There is thus no doubt that the object of the conspiracy was to violate the narcotics laws of the United States; that the conspiracy was carried on partly in and partly out of this country; and that overt acts were committed within the United States by co-conspirators.");  *United States v. Winter*, 509 F.2d 975, 982 (5th Cir. 1975) ("[T]he District Court has jurisdiction over a conspiracy and all those proved to be conspirators if the conspiracy is designed to have criminal effects within the United States and if there is sufficient proof that at least one of the conspirators committed an overt act in furtherance of the conspiracy within the territorial jurisdiction of the District Court.")

the United States has sovereignty or has some measure of legislative control." *Foley Bros.*, 366 U.S. at 285, 69 S. Ct. at 577.

Generally, courts will give extraterritorial effect to penal statutes where congressional intent is clear. *See Bowman*, 260 U.S. at 98, 43 S. Ct. at 41; *United States v. Perez-Herrera*, 610 F.2d 289, 290 (5th Cir. 1980). MacAllister argues that the language of 21 U.S.C. §§ 963[5] and 953[6] does not explicitly provide for extraterritorial application. He is correct; however, *Bowman*[7] established the rule that Congress need not expressly provide for extraterritorial application of a criminal statute if the nature of the offense is such that it may be inferred.[8] Under this rule, the district court properly

---

[5]     21 U.S.C. § 963 provides that:
    Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or the conspiracy.

[6]     21 U.S.C. § 953 states in relevant part that:
    (a) It shall be unlawful to export from the United States any narcotic drug in schedule I, II, III, IV . . . .

[7]     MacAllister contends that the Supreme Court overruled *Bowman* in *E.E.O.C. v. Arabian American Oil Company*, 499 U.S. 244, 111 S. Ct. 1227 (1991). We disagree. *Aramco* considered "whether Title VII applies extraterritorially to regulate the employment practices of United States employers who employ United States citizens abroad." *Aramco*, 499 U.S. at 246, 111 S. Ct. at 1229. The Court concluded that the petitioner fell short of demonstrating a clear congressional intent that Title VII should be applied beyond our territorial boundaries. *Id*. at 249, 111 S. Ct. at 1231. MacAllister wishes to apply this holding by analogy to his case.
    Employment discrimination, unlike drug smuggling, is not by definition an international activity, and therefore under *Bowman's* rule, Title VII would not be applied extraterritorially. Furthermore, *Aramco* is a civil case that has no connection to the *Bowman* rule, which applies only in criminal cases. *Aramco* does not even mention *Bowman*, let alone suggest that *Bowman* should be overruled. *See Felix-Gutierrez*, 940 F.2d 1200, 1205 n.3 (9th Cir. 1991) ("*Arabian American* did not purport to overrule this [*Bowman*] exception, nor did it even mention *Bowman*. Accordingly, we must assume that the *Bowman* exception--which we have applied here--remains the law.")

[8]     On authority of *Bowman*, courts have routinely inferred congressional intent to provide for extraterritorial jurisdiction over foreign offenses that cause domestic harm. *See, e.g.,*

concluded that drug smuggling is an offense where extraterritorial application is inferred. "[B]y its very nature [drug smuggling] involves foreign countries, and . . . the accomplishment of the crime always requires some action in a foreign country . . . ." *Brulay v. United States*, 383 F.2d 345, 350 (9th Cir. 1967). Logic dictates that Congress would not have passed a drug conspiracy statute that prohibits international drug smuggling activities, while simultaneously undermining the statute by limiting its extraterritorial application. *See United States v. Vasquez-Velasco*, 15 F.3d 833, 839 n. 4 (9th Cir. 1994) ("Limiting the jurisdiction of drug smuggling statutes to activities that occur within the United States would severely undermine their scope and effective operation.").

Prior to giving extraterritorial effect to a penal statute, we consider whether doing so would violate general principles of international law. *Vasquez-Velasco*, 15 F.3d at 839; *Chua Han Mow*, 730 F.2d at 1311. In this case, it would not.

We need not provide an in-depth analysis of each international law principle of jurisdiction.[9] It is sufficient to state that the objective territorial principle justifies extraterritorial application of

---

*United States v. Benitez*, 741 F.2d 1312, 1316-17 (11th Cir. 1984) (conspiracy to murder government agents, assaulting government agents); *United States v. Baker*, 609 F.2d 134 (5th Cir. 1980) (possession and conspiracy to import marijuana); *United States v. Perez-Herrera*, 610 F.2d 289 (5th Cir. 1980) (attempt to import marijuana into the United States); *see also, United States v. Vasquez-Velasco*, 15 F.3d 833, 839 n.4 (9th Cir. 1994) (murder to further a drug-trafficking enterprise in violation of 18 U.S.C. § 1959); *United States v. Felix-Gutierrez*, 940 F.2d 1200, 1204 (9th Cir. 1991) (accessory after-the-fact to kidnaping and murder of government agent); *Chua Han Mow v. United States*, 730 F.2d 1308, 1311 (9th Cir. 1984) (conspiracy to import drugs into the United States in violation of 21 U.S.C. § 963).

[9] The law of nations permits the exercise of criminal jurisdiction by a nation under five general principles: (1) the "objective" territorial, (2) the national, (3) the protective, (4) the universal, and (5) the passive personality. *United States v. Benitez*, 741 F.2d 1312, 1316 (11th Cir. 1984) (citing *Rivard v. United States*, 375 F.2d 882, 885 (5th Cir. 1967)). Extraterritorial application of penal laws may be justified under any one of these five principles. *Id*.

these statutes.[10]  The objective territorial principle applies where the  defendant's actions either produced some effect in the United States, or where he was part of a conspiracy in which any conspirator's overt acts were committed within the United States' territory.  *Baker*, 609 F.2d at 138 (citing *United States v. Postal*, 589 F.2d 862, 869 (5th Cir. 1979)).  In the present case, MacAllister was a part of a conspiracy that intended to participate in and take advantage of the drug trade between the United States and Canada.  Coconspirators committed acts in furtherance of the conspiracy within the territorial boundaries of the United States.  This conduct has a detrimental effect on our nation.  We conclude that extraterritorial application is permitted under the objective territorial principle of international law.

MacAllister asserts that extraterritorial application of § 963 is unreasonable based on the principles set forth in § 403(2) of the Restatement (Third) of the Foreign Relations Law of the United States.[11]  We conclude otherwise.  "[D]rug smuggling is a serious and universally condemned

---

[10]    Courts have defined the "objective" territorial principle to permit the prohibition not only of acts occurring within the United States, but also those occurring outside the United States' boundaries that produce detrimental effects within the national territory.  *Felix-Gutierrez*, 940 F.2d at 1205-06.

[11]    Section 403(2) of Restatement (Third) provides:
(2)  Whether exercise of jurisdiction over a person or activity is unreasonable is determined by evaluating all relevant factors, including, where appropriate:
        (a)  the link of the activity to the territory of the regulating state, *i.e.*, the extent to which the activity takes place within the territory, or has substantial, direct, and foreseeable effect upon or in the territory;
        (b)  the connections, such as nationality, residence, or economic activity, between the regulating state and the person principally responsible for the activity to be regulated, or between that state and those whom the regulation is designed to protect;
        (c)  the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;
        (d)  the existence of justified expectations that might be protected or hurt by the regulation;

offense," and therefore, "no conflict is likely to be created by extraterritorial regulation of drug traffickers." *Vasquez-Velasco*, 15 F.3d at 841 (quoting Restatement § 403, Rptr. n. 8 (1987)). We conclude that giving extraterritorial effect to § 963 in MacAllister's case is appropriate.

Finally, MacAllister argues, in the alternative, that subject matter jurisdiction has been manufactured by the efforts of DEA agents. There is no evidence in the record to support this argument, and we therefore reject it.

AFFIRMED.

---

(e) the importance of the regulation to the international political, legal, or economic system;

(f) the extent to which the regulation is consistent with the traditions of the international system;

(g) the extent to which another state may have an interest in regulating the activity; and

(h) the likelihood of conflict with regulation by another state.